**Brian Leon MURPHY, Appellant,**

v.

**Diane M. BONANNO, Appellee.**

**No. 93–CV–341.**

District of Columbia Court of Appeals.

Argued March 6, 1995.

Decided Aug. 7, 1995.

Thomas M. O'Malley, Rockville, MD, for appellant.

Gilbert F. Shelsby, Jr., Baltimore, MD, for appellee.

Before SCHWELB, FARRELL, and RUIZ, Associate Judges.

FARRELL, Associate Judge:

In this appeal from a judgment in favor of the remaining plaintiff-appellee for assault and battery, trespass, and infliction of emotional distress, appellant challenges primarily the trial judge's refusal to allow cross-examination of his estranged wife (one of the two plaintiffs) regarding prior acts that appellant argues bore directly on her veracity as a witness/complainant in the present case. We hold that the judge erred in excluding this evidence at the threshold as irrelevant. We do not direct a new trial, however, but vacate the judgment and remand for further consideration by the judge of the admissibility of the evidence in light of the principles discussed in this opinion.

## I.

### A. The Proceedings

On July 12, 1991, a criminal jury found Brian Leon Murphy, appellant in this case, guilty of two counts of assault and one count of unlawful entry.[1] The charges arose from events involving Mr. Murphy, his then-wife Elizabeth A. Murphy, and Diane M. Bonanno at the dwelling of Bonanno on June 21, 1990.

On June 20, 1991, Bonanno and Ms. Murphy filed a civil complaint in Superior Court stemming from the June 21 events. The complaint, and a September 25, 1991 amended complaint, sought damages for assault and battery, false imprisonment, false arrest, trespass, trespass to chattel/conversion, invasion of privacy, and intentional infliction of emotional distress. On September 11, 1991, Mr. Murphy counterclaimed against Ms. Murphy and Bonanno seeking damages for false arrest, malicious prosecution, and conversion.

A jury trial began on December 14, 1992. On December 16, after all the evidence had been presented, Judge George W. Mitchell dismissed all three causes of action in the counterclaim and all of the plaintiffs' claims

except assault and battery, trespass, and infliction of emotional distress.[2] The jury returned a verdict for Bonanno on all three of her claims, for Ms. Murphy on her claims of assault and battery and infliction of emotional distress, and for Mr. Murphy on Ms. Murphy's claim of trespass. The jury awarded Bonanno $7,500 compensatory damages and $15,000 punitive damages for trespass, $7,500 compensatory damages and $15,000 punitive damages for assault and battery, and no compensatory or punitive damages for infliction of emotional distress. Ms. Murphy received similar damages. Following denial of Mr. Murphy's motion for judgment notwithstanding the verdict and a new trial, and his notice of appeal as to both judgments, the Murphys settled their suit and the appeal was dismissed as to Ms. Murphy, leaving only Mr. Murphy's appeal as to Bonanno for resolution by this court.

### B. The Facts

Plaintiffs' evidence at trial established that the Murphys married in 1976 but became estranged in the mid–1980's. In the first half of 1990, there were times when, rather than stay at the Murphys' Woodbridge, Virginia home, Ms. Murphy resided with her friend Bonanno.

On the evening of June 21, 1990, Ms. Murphy was spending the night at Bonanno's house. At about 10:00 p.m., there was a knock at the door. Ms. Murphy testified that she approached the door, turned the lock, and started to open the door; at that point, Mr. Murphy "burst into the house." He was carrying a shotgun or a rifle and appeared to be "extremely angry"; he also had a gun in his right rear pocket. After throwing Ms. Murphy down onto a marble table, he pumped the shotgun and "put the gun in [Ms. Murphy's] stomach." He screamed obscenities at her, called her a "whore" and a "prostitute," and accused her of having extramarital affairs. As a result of the attack, Ms. Murphy sustained bruises on her back, legs, and buttocks. Mr. Murphy

---

**1.** This court affirmed Murphy's convictions in *Murphy v. United States,* No. 91–CF–1240 (D.C. Nov. 23, 1992).

**2.** None of these dismissal actions is the subject of this appeal.

then entered Bonanno's bedroom while holding his rifle with both hands; he screamed that Bonanno was running a "whore house."

Mr. Murphy walked Ms. Murphy out of the house while pointing the rifle at her, and told her, "You're going with me." She agreed to accompany him, but persuaded him to let her take her own car. Mr. Murphy apparently drove off in his truck while Ms. Murphy entered her car and locked the door. She then ran back into Bonanno's house and called the police.

Mr. Murphy presented a very different version of events. According to his witnesses, near 10:00 p.m. on June 21, Brian Murphy, his father Robert Murphy, and Pete Harner congregated at a Kensington shop owned by Brian Murphy. Mr. Murphy knew that his wife was staying at Bonanno's house that evening. The three men agreed to drive to Bonanno's house, since Murphy was "extremely upset" and "wanted to confront [his wife] with [certain] information that [he] had." He also wanted "to get back in touch with his wife and talk to her," because "apparently their marriage had fallen apart."

Murphy and his father drove to Bonanno's home in Brian's truck; Harner followed in his van. Brian did not have a handgun on his person, but a shotgun that he owned was in the rear of his truck because "it was always" there. Brian stopped his truck and parked in front of Bonanno's house. Robert Murphy left the truck, crossed the street, and hid behind a tree. Harner stopped his van two or three car lengths past Brian's truck and stayed in the van. Murphy approached Bonanno's house, not carrying a gun, but instead carrying a tape recorder.[3] He knocked on the front door and the door opened; he did not push it open. He then entered.

Ms. Murphy appeared to be "very upset," and she and Brian began shouting at each other. Ms. Murphy stumbled on the rug and fell backwards onto the coffee table. Brian asked her if there were any men in the house, and accused her of having an affair. Bonanno "asked Brian to come in[to Bonanno's room] and check to make sure there [were] no men in there." He then walked into Bonanno's room. At no time that evening did he push or strike his wife.

After Murphy had been in Bonanno's house for five or ten minutes, his wife left the house and he followed her. The couple stood by the front fender of Brian's truck and "had a discussion," which ended with him telling her, "Well, I can't make you." She crossed the street, entered her car, and started the engine. When Robert Murphy emerged from behind the tree, he and Brian drove off in Brian's truck, and Harner left the scene as well.

**II.**

Appellant's principal claim on appeal, and the only one we discuss in detail, is that the trial judge erred in refusing on relevance grounds to permit cross-examination of Ms. Murphy about several prior instances of asserted conduct reflecting poorly on her veracity as a witness.[4] As pointed out above, the judgment as to Ms. Murphy is not before us on appeal. It is undeniable, however, that she was a crucial witness at trial in respect to Bonanno's claims against appellant as well. First, Bonanno lacked personal knowledge of whether Ms. Murphy consented to her husband's entry of the home; only the wife was an eyewitness to the asserted trespass into the home on which the jury's award to Bonanno was partly based. Second, although the issue of whether Murphy assaulted his wife is not directly before us, Ms. Murphy's testimony about her husband's violence to-

---

3. The tape recorder was introduced into evidence as Defendant's Exhibit Number 3.

4. We reject summarily appellant's argument that the trial judge abused his broad discretion in refusing to enter a default judgment against Bonanno for delay in answering appellant's counterclaim. *See, e.g., Iannucci v. Pearlstein*, 629 A.2d 555, 559 (D.C.1993). We likewise find no abuse of discretion in the trial judge's refusal to

admit in evidence a recorded tape containing purported evidence of Ms. Murphy's extramarital affairs. As indicated above, note 3, the tape recorder itself, which appellant claimed to have carried to the house with him, was admitted in evidence in order to permit him to argue that, with the recorder in his hands, he could not have pumped the shotgun twice as Ms. Murphy testified.

ward her following entry of the house corroborated Bonanno's testimony about the assault on her, in which appellant entered her bedroom brandishing a rifle and accused her of running a "whore house." In addition, Ms. Murphy testified about her husband's formidable collection and frequent possession of the type of weapons he allegedly wielded in assaulting both Bonanno and Murphy. As Bonanno witnessed far less of Mr. Murphy's conduct in the house than Ms. Murphy related in her testimony, we cannot brush aside appellant's challenge to the restrictions on cross-examination as mooted by the dismissal of the appeal as to Ms. Murphy. We therefore turn to the claimed suppression of proper impeachment.

### A.

In the course of cross-examining Ms. Murphy, appellant sought permission to cross-examine her about three prior actions of his wife which he claimed bore significantly on her veracity and her motive in bringing the present suit for damages.[5] First, appellant proffered that at an unidentified time in the past, a creditor-bank had demanded extra collateral on a loan incurred by Ms. Murphy. In response, she had pledged her husband's automotive company, Car Doctor, as collateral and given the bank a financial statement purporting to state the value of the company when, according to appellant, she "had no knowledge as to what the value of Car Doctor was."

Perhaps more significantly, appellant proffered evidence that on two occasions (again unidentified by date) he and Ms. Murphy had occupied the same automobile and been involved in accidents from which neither suffered injury. Nevertheless, in each case Ms. Murphy submitted a "false and fraudulent" claim with an insurance company, apparently

for injuries, and received payments of $33,000 and $5,000, respectively.

Third, appellant proffered that "a certain doctor" had once loaned Ms. Murphy $50,000 and that five years later, when she had made no payments, the financially troubled doctor sought repayment. Ms. Murphy instead invited him to "the apartment" promising to give him a paper covering the loan, but then endeavored to "forc[e]" a settlement by accusing him of "sexual harassment" or "sexual assault." She and the doctor then indeed entered a settlement concerning the debt. Appellant argued that the present suit was yet another instance of Ms. Murphy's attempting to "extort" payment falsely through the vehicle of a lawsuit.

The trial judge sustained objections to each proposed line of cross-examination on grounds of relevance. As to the first (the alleged false financial statement), he gave no further explanation. As to the second and third, he ruled out both as essentially "collateral" because, as he stated, each was proffered to show nothing more than that Mrs. Murphy was a "litigious person," *i.e.*, that because she had filed false insurance claims or threatened suit against someone in the past, she was fabricating her present claim. The ruling might be different, the judge added, "if [there] were not a suggestion of factual basis for this [*i.e.*, the present] law suit." But there "does seem to be a factual basis for [Mr. Murphy] to be sued and [the proffered evidence is] almost a suggestion that it's a false law suit. I don't see that to be true. So for that reason I'm going to sustain the objection."

### B.

"[A] witness may be cross-examined on a prior bad act that has not resulted in a

5. In his brief, appellant cites a fourth such incident as well, namely, his wife's asserted perjury in the related criminal case when asked whether she had had an extramarital affair during their marriage. Judge Mitchell sustained an objection to appellant's question to Ms. Murphy about that prior testimony. Appellant cites settled authority that evidence of prior willingness to lie under oath is probative of a witness' present veracity. *See, e.g., Sherer v. United States,* 470 A.2d 732, 738 (D.C.1983), *cert. denied,* 469 U.S. 931, 105 S.Ct. 325, 83 L.Ed.2d 262 (1984). From the record before us, however, we are not convinced that the judge sustained objection to this question on a ground other than the form of the question. As appellant never sought clarification of the ruling or pursued the line of inquiry further, we hold that he waived his challenge to this ruling. Should a new trial ultimately be ordered, however, see *infra* p. 511, appellant is free to revisit this subject of inquiry at the retrial.

criminal conviction only where (1) the examiner has a factual predicate for the question, and (2) the bad act bears directly upon the veracity of the witness in respect to the issues involved [i]n the trial." *Portillo v. United States,* 609 A.2d 687, 690–91 (D.C. 1992) (citations and internal quotation marks omitted); *accord Woodward & Lothrop v. Hillary,* 598 A.2d 1142, 1149 (D.C.1991); *Roundtree v. United States,* 581 A.2d 315, 323 (D.C.1990). The second prong of this test, "[like] Federal Rule[ ] of Evidence [608(b) ]," asks whether "th[e] [prior bad] acts are ... [']probative of truthfulness or untruthfulness.' " [6] *Woodward & Lothrop,* 598 A.2d at 1150. Thus, although "this court has not adopted the federal rules," *Sherer v. United States, supra* note [5], 470 A.2d at 738 n. 6, and though the law of the District of Columbia is not necessarily "identi[cal]" to Rule 608(b), *see Woodward & Lothrop,* 598 A.2d at 1150 n. 11, this court has looked to decisions of the federal courts applying Rule 608(b) in determining whether a bad act "bears directly upon the veracity of the witness in respect to the issues involved in the trial." *See id.* at 1150.

■ In ruling on proposed inquiry into specific prior acts, the trial court "is vested with broad discretion" in two ways. *Roundtree,* 581 A.2d at 323. "First, notwithstanding the fact that a party proposing cross-examination claims to have a 'factual predicate' for inquiry into prior bad acts, the trial court may assess the questioner's offer of proof to determine whether such a factual predicate exists." *Id.* Second, the court (a) may "impose reasonable limits" on cross-examination to prevent, among other things, "harassment, prejudice, confusion of the issues," physical harm to the witness, "or interrogation that is repetitive or only marginally relevant," *id.* (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986)); or (b), "[w]ith regard to prejudice, ... may preclude a proposed line of cross-examination 'if it appears that the danger of unfair prejudice will out-

weigh its probative value.' " *Roundtree,* 581 A.2d at 323 (quoting *Lee v. United States,* 454 A.2d 770, 775 (D.C.1982), *cert. denied,* 464 U.S. 972, 104 S.Ct. 409, 78 L.Ed.2d 349 (1983)).

■ But "[a] trial judge abuses discretion where he or she 'fails to exercise choice in a situation calling for choice.' " *Roundtree,* 581 A.2d at 324 n. 22 (D.C.1990) (quoting *Johnson v. United States,* 398 A.2d 354, 363 (D.C.1979)). That situation may arise where the trial judge "[i]s insufficiently cognizant of h[is] discretion," does not "reflect[ ] an awareness of discretionary factors," or makes his ruling "under an assumption that cross-examination about [the prior bad acts at issue is] precluded as a matter of law." *Roundtree,* 581 A.2d at 324 n. 22; *see also Woodward & Lothrop,* 598 A.2d at 1150 (suggesting that, were "[t]he trial judge [not] ... as surprised as anyone by [the witness'] answer [admitting prior conduct amounting to embezzlement]," the trial judge could be "faulted for failing to" "balance the probative value of the impeachment against its potential for prejudice").

## C.

■ The trial judge erred in barring inquiry into each of the proposed lines of cross-examination on the threshold ground of relevance. In the usual case, relevance is not a demanding test to satisfy. "Relevant evidence is that which tends to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence." *Punch v. United States,* 377 A.2d 1353, 1358 (D.C.1977), *cert. denied,* 435 U.S. 955, 98 S.Ct. 1586, 55 L.Ed.2d 806 (1978). Laying aside questions of temporal remoteness and lack of sufficient factual predicate, the proffered evidence that Ms. Murphy filed false financial information which she knew to be false with a bank-creditor,[7] that she fabricated personal injury claims to secure insurance payments, or that she threatened to claim sexual harassment (presumably in a legal forum) to extort settlement of a debt, if

---

6. Although the *Woodward & Lothrop* court stated "clearly probative," it misquoted Federal Rule of Evidence 608(b), which does not contain the qualifier.

7. Of course, Ms. Murphy (assuming the event took place at all) might simply have been "estimating" the value of her husband's company, but that is not a question of relevance.

accepted by a jury, would certainly be probative of whether her present allegations to which she testified at length were worthy of belief.

As to the first, federal courts have held that conduct amounting to "making false statements of a variety of kinds" is "probative of truthfulness or untruthfulness" within the meaning of Federal Rule of Evidence 608(b). 3 JACK B. WEINSTEIN, ET AL., WEINSTEIN'S EVIDENCE ¶ 608[05], at 608–46 (1995); *see, e.g., United States v. Sullivan,* 803 F.2d 87, 90–91 (3d Cir.1986), *cert. denied,* 479 U.S. 1036, 107 S.Ct. 889, 93 L.Ed.2d 841 (1987); *United States v. Reid,* 634 F.2d 469, 473–74 (9th Cir.1980), *cert. denied,* 454 U.S. 829, 102 S.Ct. 123, 70 L.Ed.2d 105 (1981). Evidence that Ms. Murphy filed false insurance claims would be admissible under this principle as well.

The trial judge excluded the second and third lines of questioning (and possibly the first) on grounds that they showed nothing more than that Ms. Murphy was "litigious" or claim-minded. But even if that were so, it is not a ground for categorical exclusion of the evidence. It has been said that "the courts of the District of Columbia are notably liberal in receiving evidence of claim-mindedness and allowing the jury to assess its weight." *Roundtree,* 581 A.2d at 337 (Schwelb, J., concurring in part and dissenting in part). Decisions binding on us firmly indicate the relevance of such evidence to assessing the truth of the witness' present allegations. *See Lawrence v. United States,* 482 A.2d 374, 377–78 (D.C.1984) (in prosecution for carnal knowledge and indecent liberties with a minor, cross-examination of victim's relative on whether relative had made prior allegations of sexual abuse within the family was "essential to an assessment of [the relative]'s credibility as a government witness"; reversing convictions because of curtailment of this line of inquiry); *Manes v. Dowling,* 375 A.2d 221, 223 (D.C.1977) ("[i]n this jurisdiction, it has been held permissible to introduce evidence on prior accidents and claims"); *Evans v. Greyhound Corp.,* 200 A.2d 194, 196 (D.C.1964) ("[t]he appellant's

answers [on cross-examination] respecting two prior injury claims[, for which she had received payments in settlement,] were properly admitted"); *Mintz v. Premier Cab Ass'n,* 75 U.S.App.D.C. 389, 390, 127 F.2d 744, 745 (1942) ("It was for the jury to decide from all the evidence ... whether [appellant] was merely unlucky or was 'claim-minded' "); *see also Hemphill v. Washington Metro. Area Transit Auth.,* 299 U.S.App.D.C. 184, 185–86, 982 F.2d 572, 574–75 (1993) (applying District of Columbia law) (Ruth Bader Ginsburg, J., concurring in the judgment). For this reason, the judge could not properly exclude examination on the prior acts merely because, as he stated, they were "collateral." *See Kitchen v. United States,* 95 U.S.App. D.C. 277, 279, 221 F.2d 832, 834 (1955) ("questions *upon collateral issues* for impeachment purposes on cross-examination are permissible if the subject matter of the question bears directly upon the veracity of the witness in respect to the issue involved in the trial") (emphasis added), *cert. denied,* 357 U.S. 928, 78 S.Ct. 1378, 2 L.Ed.2d 1374 (1958).

Of course, as *Roundtree, supra,* makes clear, a finding of relevance by no means exhausts the question of admissibility. Because the trial judge erroneously barred the cross-examination on relevance grounds, however, he never exercised the discretion he retained to admit, exclude, or limit the questioning on the grounds referred to earlier.[8] That is, the judge did not determine first whether Mr. Murphy had an adequate "factual predicate" for the proffered questions, which were of a kind that, if hurled into the proceedings recklessly, could work unfair prejudice to Ms. Murphy despite her (expected) denial of the accusations. Our decisions do not establish a formal standard by which the factual basis for proffered evidence is measured. But, as noted in *Roundtree,* we sustained the exclusion of such evidence in *Sherer v. United States, supra* note [5], where the defendant's offer of proof that the statements were false was " 'scanty.' " *Roundtree,* 581 A.2d at 323 (quoting *Sherer,* 470 A.2d at 739).

---

**8.** Contrary to the judge's suggestion, admissibility of the prior acts on cross-examination did not

depend on a preliminary determination of whether the *present* allegations were well-founded.

Beyond this fairly undemanding initial scrutiny, the *relative* strength of the factual proffer comes into play once again when the judge proceeds to balance the probative value of the impeachment against its potential for prejudice, including its capacity to besmirch the witness unfairly, delay the proceedings, or distract the jury by a quarrel over the facts of what remains after all a collateral incident. As the court stated in *Roundtree* with respect to prior sexual allegations claimed to be false,

> [i]n exercising discretion whether to permit cross-examination into [these claims], the precise probative value of such evidence, even where it clears [the two-part test for inquiry into specific instances of a witness' conduct], will depend upon the degree of certainty with which the trial court can conclude that the prior allegations were false. The stronger the evidence that the allegations are false, the greater the probative value.

581 A.2d at 323–24 (footnote omitted).

These principles dictate the course the judge should have followed in this case. For example, appellant's factual proffer with respect to the assertedly bogus insurance claims was fairly specific (except as to dates), including the precise amounts recovered by his wife. On the other hand, the assertion that Ms. Murphy lured the doctor to her apartment to lay the ground for a false claim of sexual harassment and extort a settlement might turn out, on minimal examination, to rest on mere conjecture from the fact that the parties compromised the debt. A ruling based on this sort of inquiry would have implicated the judge's broad discretion in this area, *see, e.g., Hemphill,* 299 U.S.App. D.C. at 186, 982 F.2d at 574 (Ruth Bader Ginsburg, J., concurring in the judgment) ("Controlling current authority ... recognizes that evidence of prior acts used to discredit a witness' testimony is often highly prejudicial and therefore should be permitted only when clearly probative of credibility"), subject to reversal only for clear abuse. *Roundtree,* 581 A.2d at 323. But by errone-

ously excluding the evidence on the threshold ground of relevance, the judge never exercised the discretion committed to him.

Nevertheless, we do not reverse and remand for a new trial, but instead will remand for the judge to reconsider the proposed lines of cross-examination under the principles discussed. That inquiry is necessarily *post hoc,* but it forestalls the possibility of a new trial if, in the last analysis, no new trial is necessary. Given what we have determined to be the relevance of the proffered evidence, the judge should order a new trial if, after considering the factual basis of the proffer and weighing it in the manner described above, he concludes that all, or substantially all, of the proposed questioning about Ms. Murphy's prior conduct should have been permitted.[9] On the other hand, if the judge concludes that most of the alleged conduct is excludable under a proper exercise of discretion and that the rest probably would not have affected the outcome even if admitted, then he should reenter judgment for Ms. Bonanno.

*Judgment vacated and case remanded for further proceedings.*

---

9. We may spare the judge inquiry into whether *other* cross-examination which he did allow of Ms. Murphy would be sufficient to offset the exclusion of all or substantially all of the questioning about the prior acts in dispute. It would

not. Although appellant was able to cross-examine her about prior inconsistent statements she had made, the exclusion of all or most of the proposed cross-examination at issue could not be said to be harmless.