**Didiar VELASQUEZ, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 00–CF–297.

District of Columbia Court of Appeals.

Argued Dec. 7, 2001.

Decided June 20, 2002.

74

Donald L. Dworsky, was appointed by the court, for appellant.

Lisa Monaco, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time the brief was filed, and John R. Fisher and Ann M. Carroll, Assistant United States Attorneys, were on the brief for appellee.

Before WAGNER, Chief Judge, and SCHWELB and FARRELL, Associate Judges.

WAGNER, Chief Judge.

Appellant, Didiar Velasquez, was convicted following a jury trial of assault with intent to commit first-degree sexual abuse, D.C.Code § 22–501 (1981) (recodified as D.C.Code § 22–401 (2001)); and threatening to injure a person, D.C.Code § 22–2307 (1981) (recodified as D.C.Code § 22–1810 (2001)).[1] He argues for reversal on the principal ground that the trial court violated his Sixth Amendment right to confront the witness against him by limiting his cross-examination of the complaining witness. Finding no reversible error, we affirm.

## I.

The charges arose out of an incident which occurred while the complaining witness, S.L., was babysitting the three-year-old daughter of her cousin, Myra Fuentes, at an apartment which they shared on W Street, N.W. in the District of Columbia. Ms. Fuentes was Velasquez' common law wife, and they had two children together. According to S.L.'s testimony, Velasquez appeared at the apartment that day and asked to see his son, but Ms. Fuentes had taken him to work. He complained about his daughter being undressed and cold, which S.L. noted was true because the air conditioner was on. S.L. took the child into the bedroom and began dressing her, but noticed Velasquez at the bedroom door. She testified that Velasquez took her by the arms and said, "I like you and you are going to be mine." He then threw her on the bed and "threw himself over" her. She asked him to leave, but Velasquez put a pillow over her face and said that he would kill her if she screamed. S.L. testified that Velasquez was on her legs and started to take his pants off and show her

---

1. The government dismissed additional counts of first-degree sexual abuse, attempted first-degree sexual abuse, second-degree sexu-
al abuse, obstruction of justice, and kidnapping arising out of the same incident.

"his parts." She protested, reminding him that his daughter was there and asking him to stop for her sake. However, she said that Velasquez continued to undress and threw himself on her, and his penis touched her legs and her vagina. She testified that Velasquez did not penetrate her because he had no erection. S.L. testified that she finally discouraged him by suggesting that they see each other away from their cousins. Velasquez, who smelled of alcohol, seemed to question her sincerity at first, but then went into the living room, put on his pants, and fell asleep on the sofa. After she was certain that he was asleep, S.L. telephoned the police and called Ms. Fuentes at work. She testified that she told Ms. Fuentes that Velasquez tried to abuse her. S.L. made a second call to the police when they did not arrive soon enough.

The first officer to arrive, Kenneth Dunn, testified that he found S.L. crying, nervous and shaken, in a crouch-down position, in the lobby of the building, along with the child. A Spanish-speaking officer, Kenneth Harvey, started to interview the complainant, but called for the sex squad, as required, when he learned the sexual nature of the assault complaint.[2] Detective Ricardo Proctor, who was then assigned to the Sex Offense Branch of the Metropolitan Police Department, came to the apartment and spoke to S.L. through another Spanish-speaking interpreter, Nelson Valdes. S.L. went with the officers back to the apartment where they found Velasquez asleep on the couch. Officer Harvey testified that he shook Velasquez' arm in order to awaken him, and when he came around, the officer asked him how he was doing. According to the officer, Velasquez responded, "I'm just, you know, laying here drunk." The officer asked him for identification, and Velasquez said, "I didn't do anything—I didn't do anything to her."[3] After Harvey interviewed S.L., the officers placed Velasquez under arrest, and he was described as becoming "very angry" and "ugly." Officer Valdes testified that Velasquez, directing his remark toward the bedroom area where S.L. was, said loudly, "you are going to regret this and—and I know where your daughter lives."[4]

There was evidence that Velasquez' sweater, found in S.L.'s bedroom, was recovered by the police, along with the bedspread, a pillow and S.L.'s shorts and underwear. A hair was found on the sweater which was submitted for forensic examination. An expert in the area of hair and fiber examinations testified that the hair was "consistent with [hair] originating from [Velasquez], although hair comparison is not a form of absolute identification." The government also introduced evidence that Velasquez knew that he had a scheduled court date, and that he nevertheless told his cousin that he was going to

2. Officer Harvey testified that he is certified through the State Department as a Spanish interpreter.

3. Velasquez filed a motion to suppress this statement, arguing that he was in custody at the time it was made and that he was not given *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The trial court, after an evidentiary hearing, concluded that there was no custodial interrogation and denied the motion.

4. There is some confusion in the transcript, but S.L. testified that she heard someone named Lillian ask her cousin "do you know where this one's daughter lives." According to S.L., her cousin did not respond, but Velasquez said "because we are going to kill him [sic]." S.L. testified that she was careful with her daughter thereafter, whom she acknowledged during cross-examination, lived in California at the time with S.L.'s mother.

Texas to look for work. Velasquez was arrested in North Carolina, where he was found using a North Carolina driver's license with his photograph and the name Mauricio Mendoza.

Myra Fuentes, testifying for the defense, denied that Velasquez ever asked where S.L.'s daughter lived or threatened S.L. or her daughter on the date of the offense. Initially, she admitted on direct examination that S.L. told her that Velasquez tried to abuse her.[5] Subsequently, in response to defense counsel's questions, Ms. Fuentes said that S.L. told her that nothing had happened and that she only called the police to scare Velasquez. Ms. Fuentes testified further that a few days later she again asked S.L. why she had called the police and that this time, S.L. said "so that [Velasquez] would respect women."

In rebuttal, a witness who was present during Ms. Fuentes' interview with the police and prosecutor testified that S.L. had said on the day of the offense, "come home, he's drunk," and something about "he tried," and then hung up. She said that Ms. Fuentes said that she then called S.L. back and that is when S.L. said that Velasquez tried to abuse her. Officer Harvey testified in rebuttal that when Ms. Fuentes spoke to Velasquez at the apartment, she asked him in Spanish what had happened, and he responded, "I don't know why they're here, I didn't do anything, you know. She's lying. Go back there and tell her that she's lying." Finally, S.L. testified that a few days after the assault, she had spoken to Ms. Fuentes who asked what happened. S.L. said that she told Ms. Fuentes that Velasquez had taken "his clothes off and started to show her his parts." S.L. later explained that she did not tell Ms. Fuentes that Velasquez touched her because she was ashamed and because she did not want her to talk about it at work.

## II.

Velasquez argues that the trial court erred in precluding him from cross-examining the complaining witness, S.L., concerning her mental illness after the assault. He contends that such evidence is relevant to the witness' bias and credibility. The government argues in response that Velasquez had no constitutional right to cross-examine the witness in this area because he could not establish that S.L.'s mental illness, three years after the assault, was relevant to her testimony at trial. Further, the government contends that Velasquez could not show convincingly that any delusional statements that S.L. made to her doctors were intentionally false, and therefore, he had no constitu-

---

5. In the examination that followed, she said in response to defense counsel's questions:

Q. Did you ask her what she meant by that?
A. Yes.
Q. And what did she say?
A. Just that she told me—she didn't say anything.
Q. Did she tell you if he had abused her?
A. No. She said he hadn't done anything to her.

\* \* \* \*

Q. Ms. Fuentes, that afternoon did Ms. [S.L.] ever tell you that Mr. Velasquez touched her?

A. No.
Q. Did she ever tell you that he grabbed her and threw her on the bed?
A. No.
Q. Did she ever explain to you what she meant by, "He tried to abuse me?"
A. No just that.
Q. When she told you that nothing happened—that he had done nothing to her, what did you say?
A. If he didn't do anything to you, why did you call the police?
Q. And what did she say?
A. She said that she only did it to scare him.

tional right to inquire. Thus, the government contends, the trial court acted within its discretion in limiting cross-examination.

## A. Factual Context of Sixth Amendment Challenge

The government moved *in limine* to preclude cross-examination of S.L. concerning her suffering a mental breakdown which resulted in her hospitalization in May 1999, some three years after the offense date.[6] These medical records indicated that S.L. told her doctors that she thought that her pastor and his wife were trying to kill her. The government also represented that S.L. had been on medication (Haldol) at the time of her hospitalization and for one week thereafter, and that two weeks before trial, she completed using prescription medication to relieve the side effects of the Haldol. The May 1999 medical records referred to S.L.'s treatment in 1996 for depression following the assault. Defense counsel argued that S.L.'s statements to her doctors during her 1999 episode were evidence that she had made prior false accusations, which were probative of her credibility, veracity and truthfulness at trial.

The trial court rejected the defense argument. It reasoned that:

> The defendant has, in my view, failed to justify an invasion into the witness' privacy and an invasion into her prior mental health history because there is not a sufficient connection between what we know of her mental health history and the defense theory. There is nothing about her mental health history that supports her being an incredible witness. The fact that in May of '99, three years after this incident, she suffered a

psychotic episode and had some delusional beliefs is very different than what the defense theory is in this case, which is that she intentionally lied about the assault by Mr. Velasquez and later recanted and indicated that it was false.

> There is no expert opinion offered to support the defense theory that a psychotic delusional episode in May 1999 is relevant to what claims she made in September 1996 and whether or not those claims are credible.

The court noted the absence of a history of false reports and that, in spite of her delusional beliefs, S.L. had not attempted to charge her husband or pastor with a crime. The court observed that there was no evidence that S.L. was delusional or psychotic before May 1999. Further, the court weighed the probative value against the prejudicial effect and concluded that: (1) there was a significant degree of prejudice in the way that a lay person might view mental health history; and (2) the connection is so minimal that "the prejudice outweighs the probative value of any cross examination of S.L. in this regard." The court reconsidered the issue after S.L. testified and requested a further proffer. Defense counsel repeated its earlier reliance on the 1999 medical records. The court adhered to its earlier ruling, absent any additional information supporting a good faith basis for the inquiry.

## B. Applicable Legal Principles

 The Confrontation Clause of the Sixth Amendment protects the right of the accused in a criminal trial to confront and cross-examine the witnesses against him. *Delaware v. Van Arsdall,* 475 U.S. 673,

---

6. According to the government, it had a psychiatrist review the records, who determined that the specter of S.L.'s return to the District of Columbia from California to testify triggered her condition. Further, the government proffered that the expert found no indication that S.L. was incompetent to testify. We do not understand Velasquez to argue that the witness was not competent to testify at trial.

679, 106 S.Ct. 1431 (1986); *Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Cross-examination is an important means of testing the credibility of government witnesses by exposing any biases or reasons for the witness not telling the truth. *Guzman v. United States,* 769 A.2d 785, 790 (D.C.2001) (citing *(Rocky) Brown v. United States,* 683 A.2d 118, 124 (D.C.1996)). However, the right to cross-examination is not an unfettered right to conduct the examination in any manner. *See Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (per curiam). Rather, consistent with the Confrontation Clause, a trial judge may place reasonable limitations on cross-examination so as to avoid "harassment, prejudice, confusion of the issues . . . or interrogation that is only marginally relevant." *Van Arsdall,* 475 U.S. at 679, 106 S.Ct. 1431. The court may also limit cross-examination " 'where the prejudicial effect of the proffered evidence outweighs its probative value.' " *Guzman,* 769 A.2d at 790 (quoting *(Rocky) Brown,* 683 A.2d at 124) (quoting *Elliott v. United States,* 633 A.2d 27, 32 (D.C.1993)). "After sufficient cross-examination has been allowed to satisfy constitutional requirements, the trial court retains broad discretion to determine the scope and extent of cross-examination." *Elliott,* 633 A.2d at 32 (citations omitted). We then review the trial court's limitations on cross-examination for an abuse of discretion. *Roundtree v. United States,* 581 A.2d 315, 323 (D.C. 1990).

### 1. *The Relevance of Mental Illness*

■ Courts have found evidence of a witness' mental illness may be relevant to both competency and credibility. *United States v. Partin,* 493 F.2d 750, 762 (5th Cir.1974) (citing *Sinclair v. Turner,* 447 F.2d 1158 (10th Cir.1971), *cert. denied,* 405 U.S. 1048, 92 S.Ct. 1329, 31 L.Ed.2d 590

(1972)); *Ramseyer v. General Motors Corp.,* 417 F.2d 859 (8th Cir.1969); *United States v. Allegretti,* 340 F.2d 254 (7th Cir. 1964), *cert. denied,* 381 U.S. 911, 85 S.Ct. 1531, 1532 (1965)) (other citations omitted). As the court stated in *Partin:*

> [t]he jury should, within reason, be informed of all matters affecting a witness's credibility to aid in their determination of the truth. . . . It is just as reasonable that a jury be informed of a witness's mental incapacity at a time about which he proposes to testify as it would be for the jury to know that he then suffered an impairment of sight or hearing. It all goes to the ability to comprehend, know and relate the truth.

493 F.2d at 762; *see also Collins v. United States,* 491 A.2d 480, 485 n. 5 (D.C.1985).

### 2. *Analysis*

■ In this case, the proposed cross-examination concerned S.L.'s condition some three years after the crime charged. Therefore, it was not relevant to S.L.'s perception of events at the time of the assault. Further, the defense proffered no evidence that S.L. had a mental illness which would have affected her credibility at the time that she testified. At that time, S.L. was not on any medication. "One's psychiatric history is an area of great personal privacy which can only be invaded in cross-examination when required in the interest of justice." *United States v. Lopez,* 611 F.2d 44, 45 (4th Cir.1979). "If of minimal probative value," such an inquiry would be "manifestly unfair and unnecessarily demeaning of the witness." *Id.* Such cross-examination should not be used to " 'introduce into the case a collateral issue which would confuse the jury and which would necessitate allowing the [g]overnment to introduce testimony explaining the matter.' " *Id.* at 46 (quoting *United States v. Mucherino,* 311

F.2d 172, 174 (4th Cir.1962)) (other citations omitted). In this case, the trial court concluded that the evidence of the witness' mental condition three years after the offense would be of minimal, if any, relevance to her credibility, and that its prejudicial effect outweighed any probative value. We find no abuse of discretion in the trial court's ruling. *See Roundtree, supra*, 581 A.2d at 323.

Velasquez cites in support of his claim of error *(William) Brown v. United States*, 766 A.2d 530 (D.C.2001). In *(William) Brown*, this court determined that it was error to exclude expert psychiatric testimony concerning the complainant's disorder at the time of trial. *Id.* at 539–40. Since the record here shows that the area of inquiry did not concern the complaining witness' condition at the time of trial, *(William) Brown* is not persuasive authority for Velasquez' position. Similarly, this court's decision in *Vereen v. United States*, 587 A.2d 456 (D.C.1991), lends no support to Velasquez' position. In *Vereen*, the central question was one of the witness' competency. *Id.* at 458. The defense did not obtain the witness' medical records until after a ruling on her competency and direct examination at trial, and sought unsuccessfully to call an expert to challenge her credibility at trial. *Id.* Of great concern was that the witness experienced troubling symptoms of her illness on the day she was to testify and two nights earlier. *Id.* at 457. This court found that the trial court erred "in submitting the witness to the jury, while denying the defense access to the medical records during *voir dire* and without the benefit of hearing expert opinion as an aid in deciding competency." *Id.* at 458. In contrast, here, there was no evidence offered that the mental condition or symptoms that S.L. experienced in May 1999 persisted at the time of the trial. Defense counsel had the records and an opportunity to proffer a basis to advance any relevance of the evidence to the issues before the court.

### 3. *False Claims Theory*

■■■■ Velasquez also argues that the trial court erred in precluding cross-examination related to S.L.'s alleged "false claims." He relies upon her apparently delusional statements to her doctors accusing her pastor, his wife, and her husband of threatening acts against her. Cross-examination is allowed on similar prior allegations, if they were fabricated. *Roundtree, supra*, 581 A.2d at 321. Since "the Constitution does not require confrontation of witnesses with irrelevant evidence, the very applicability of the Confrontation Clause depends on [the complainant's] prior allegations being false." *Id.* Cross-examination is required constitutionally only where the prior allegations are shown "convincingly" to be false. *Id.* at 322 (citation omitted).

In assessing Velasquez' offer of proof, the trial court found significant that the alleged false accusations were not similar to the charges made against Velasquez. Moreover, the accusations were made during a psychotic episode to S.L.'s doctors some three years after the crime. The court found no convincing showing that the allegations were fabricated in a sense supportive of a requirement for cross-examination. Such acts should be "probative of truthfulness or untruthfulness." *Murphy v. Bonanno*, 663 A.2d 505, 509 (D.C.1995) (citation omitted). We agree with the trial court that the concededly delusional claims S.L. made to her doctor bear little relationship to her willingness to lie under oath. Thus, in assessing the offer of proof, the trial court could properly conclude that there existed no factual predicate for inquiry into the statements S.L. made to her doctors while ill. *See id.* We find no constitutional violation as a result of the

trial court's ruling. Further, the trial court acted within its discretion in imposing limits on the cross-examination on matters which were only marginally relevant, at best, and where the danger of unfair prejudice outweighed any probative value. *Id.* (citations omitted).

### III.

We need address only briefly Velasquez' remaining claims. He argues that the government failed to disclose records of S.L.'s treatment for depression in 1996 after the assault. Further, he challenges the denial of his request for a continuance of the sentencing for the purpose of obtaining the records.

At the time of sentencing, it appeared that S.L. sought and received mental health treatment after the assault. The government argued that there was no reason to believe that the out-patient treatment was for anything other than depression caused by the assault and that the same rationale for the exclusion of the 1999 records applied to the 1996 records. The trial court found the records irrelevant to S.L.'s competence to testify, and concluded that counsel could only speculate that they would provide a basis to challenge her credibility further.

*Brady* requires the government to disclose upon the defendant's request "evidence favorable to an accused . . . [and] material either to guilt or to punishment." *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The records involved here were not in the government's possession at the time of trial. Thus, there is no due process violation since the records were not in the possession of the government. *See United States v. Agurs,* 427 U.S. 97, 111, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The record reflects that the government tried, without success, to find the 1996 treatment record, which was referenced in the 1999 records, and the person who provided the treatment. The defense acknowledged as much at sentencing. In addition, there is no showing here that the evidence would have been material within the meaning of *Brady.* "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.*

The evidence would have no relevance to S.L.'s competency to testify at trial. There was no indication that the evidence of the victim's treatment after the crime would have been helpful to the defense. On the contrary, the available information confirmed that S.L. received treatment as a result of the trauma caused by the crime. Thus, it might have tended to confirm, rather than undermine, the complainant's claim. Therefore, we perceive no impairment of the defense resulting from the inability to locate the 1996 records sooner.[7]

### IV.

Finally, Velasquez argues that the trial court erred in admitting the testi-

---

7. We find no abuse of discretion in the trial court's denial of the defense request of a continuance of the sentencing to allow time for him to try to secure the records, as no prejudice is shown. *See United States v. Poston,* 284 U.S.App. D.C. 125, 131, 902 F.2d 90, 96 (1990). Velasquez could go forward with sentencing, and still move for a new trial under Super. Ct.Crim. R. 33, if he ascertained anything helpful from any records located thereafter.

mony of Officer Harvey regarding S.L.'s report of the crime. He contends that the testimony exceeded the detail permitted under the "report of rape" exception to the hearsay rule. *See Galindo v. United States*, 630 A.2d 202, 209 (D.C.1993). Under this rule, "a witness may testify that the complainant stated that a sexual crime occurred and may relate the detail necessary to identify the crime." *Id.* The rationale for admitting the evidence is: (1) to negate the assumption that if there is no such evidence, no complaint was made; (2) to show that the victim behaved as is expected traditionally, i.e. by making a prompt report; and (3) to rebut the claim of recent fabrication. *Battle v. United States*, 630 A.2d 211, 217 (D.C.1993) (citations omitted). All three reasons support the admissibility of the evidence in this case. Velasquez complains that the detail exceeded the limits necessary to rebut any claim of fabrication. Even assuming this to be the case, the error, if any, was harmless under the standard set forth in *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (error is harmless if we can "say with fair assurance, after pondering all that happened, without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error"). Although cumulative, perhaps, the other evidence strongly supported S.L.'s testimony. There were observations of the police of her shaken demeanor after the assault and a witness who heard threats made to S.L. by Velasquez. There was evidence of Velasquez' flight, tending to show consciousness of guilt. S.L.'s testimony was tested by cross-examination, and she remained firm in her account of what happened that day. Thus, we conclude, that the error, if any, was harmless under the *Kotteakos* standard. Further, we find no plain error in the trial court's failure to give, *sua sponte*, a limiting in-

struction to the jury on the proper use of Officer Harvey's testimony. *See Gilliam v. United States*, 707 A.2d 784, 786 (D.C. 1998) (en banc).

For the foregoing reasons, the judgment appealed from hereby is

*Affirmed.*