Hattie LEWIS, Appellant,

v.

Marvin VOSS, Appellee.

No. 98–CV–219.

District of Columbia Court of Appeals.

Argued Oct. 22, 1999.

Decided April 12, 2001.

---

Charles C. Parsons, Washington, DC, for appellant.

Deborah E. Kane, Greenbelt, MD, for appellee.

Before WAGNER, Chief Judge, and SCHWELB and REID, Associate Judges.

REID, Associate Judge:

In this personal injury case, appellant Hattie Lewis contends on appeal that the trial court abused its discretion by denying her post-judgment motion for a new trial; she asserts that the jury returned an inadequate verdict of $10,000.00 in her favor.[1] Specifically, she argues that the trial court erred or abused its discretion by: (1) refusing to pose specific *voir dire* questions to the jury panel relating to tort reform; (2) failing to strike certain prospective jurors for cause; and (3) allowing defense counsel to "misuse prior claims evidence prejudicially." We reverse and remand this matter to the trial court for a new damages trial.

## FACTUAL SUMMARY

The trial transcripts and record in this case reveal the following events and testimony. While driving home from work on September 21, 1995, Ms. Lewis stopped her car to wait for a traffic light signal before proceeding. Mr. Voss, who was driving the car behind Ms. Lewis, rear-ended her vehicle. Ms. Lewis testified that she "was pushed forward and back and hit [her] knee on the steering column of [her] car."[2] She remained at the scene of the accident about "forty-five minutes to an hour" but did not call for the police or an ambulance. She was "shaken up." Nonetheless, she drove herself home. When she arrived at her home she "was still shaken up and ... wasn't feeling too well." Therefore, she "took two Advil and went to bed." Even though she "was in a lot of pain around [her] shoulders and mid area," she went to work the day after the accident because she was the "accounts payable manager" at her place of employment and had to get checks out. As her pain worsened, Ms. Lewis called an orthopedic specialist who had treated her previously for a fractured finger. She was unable to get an immediate appointment and decided to return to her home.

The day after calling the orthopedic specialist, Ms. Lewis woke up with a stiff neck and "was feeling really bad." Consequently, she sought emergency room treatment at Prince George's County Hospital. Four days later, she saw Dr. Robert Allen Smith, an orthopedic specialist. At that time, Ms. Lewis "complain[ed] of pain in her neck that radiated into her left upper extremity, also pain in her left shoulder joint, pain in her upper back, and headaches."[3] She was treated for back spasms and neck strain or "a pinched nerve in the upper left extremity." About a week later, Ms. Lewis returned to Dr. Smith. In addition to the pain in her neck, shoulder and back, she revealed that she had pain and swelling in her left knee. According to Ms. Lewis, she had no problem with swell-

---

1. Mr. Voss stipulated that he was liable for the accident.

2. After the accident, Ms. Lewis noticed that: "The plastic pipe cup on the steering column was broken and it was hanging down."

3. Dr. Smith testified that Ms. Lewis had been treated by someone else in 1989 for a lower back injury.

ing or pain in her knee prior to the accident. The doctor found fluid or effusion in Ms. Lewis' knee and "mild degenerative changes" or arthritis, but no fracture. A few weeks later, Ms. Lewis returned to Dr. Smith. Her knee continued to bother her and was still swollen, but Dr. Smith determined that there was gradual improvement of her neck and shoulder. He recommended that Ms. Lewis schedule a magnetic resonance image test ("MRI"). The MRI confirmed Dr. Smith's diagnosis of arthritis, and "fluid, effusion within the joint and tenderness," but also revealed "a tear of the structure of the medial meniscus." Dr. Smith opined that "within a reasonable degree of medical probability . . . the tear rose from the accident" of September 21, 1995.[4] When asked, "[w]hat effect if any does superimposing trauma and tear on an already arthritic condition have," Dr. Smith responded: "In my experience trauma to an arthritic joint accelerates the arthritic problem because [the] arthritic joint is already compromised. So it's more susceptible to injury." To relieve Ms. Lewis' symptoms, Dr. Smith performed arthroscopic surgery on Ms. Lewis' knee in December 1995, and prescribed physical therapy. He discharged her in March 1996 after concluding that "there was not much more [he] could do for her at that point." At trial, Dr. Smith was asked whether he could "express [an opinion] to a reasonable degree of medical certainty as to whether or not [Ms. Lewis] has suffered a permanent injury?" He replied, "[S]he has [suffered a permanent injury], and . . . she doesn't have the entire normal tissue that was in her knee originally."

On cross-examination of Dr. Smith, counsel for Mr. Voss sought to establish that Ms. Lewis did not have the symptoms of a medial meniscus tear when Dr. Smith

first treated her. Dr. Smith acknowledged that the emergency room records of Prince George's County Hospital did not mention symptoms indicating a tear. However, when asked, "If someone had a complete tear as Ms. Lewis had[,] do you believe it would be reasonable that they would be able to walk without problem," Dr. Smith answered, "Yes." As counsel for Mr. Voss continued in her effort to show that the tear did not result from the accident of September 21, she had the following exchange with Dr. Smith:

Q. Degenerative arthritis in the knee can result in a tear, correct?

A. It can result in what is called a degenerative tear which

has a fairly specific appearance on orthoscopy procedure.

Q. And you did not see that here? You believed it was an acute tear?

A. Right, . . . degenerative tears . . . they look like laminated plywood basically. You know, plywood is made in layers and things are kind of laminated so it looks like a solid piece of plywood. This had one specific geometry to it.

Q. You did say degenerative problems could have predisposed her to a tear, correct?

A. Oh, absolutely.

Q. And that tear could have occurred in the motor vehicle accident, right?

A. That's my opinion.

Q. The tear could have occurred if she was stepping down a stair and turned her knee, correct?

A. That's possible.

Dr. Smith also testified that the medial meniscus tear could have resulted from "a blow or twisting injury to the knee." When asked about "a subchondral cyst"

---

4. Dr. Smith also stated: "Based upon . . . the appearance of the actual tear on the orthosco-

py original[,] my opinion is [the] tear was caused by the accident of 9/21[/95]."

that appeared in the MRI, Dr. Smith said: "That's consistent with degenerative change," which he explained "mean[t] the tissue is becoming weaker and frayed through [the] normal aging process or some previous trauma." Moreover, he agreed that the cyst did not result from the accident of September 21. Similarly, he acknowledged that the "tricompartment osteophites" or bone spurs, which also were revealed in the MRI test of the knee, were not caused by the accident. After the inquiry as to the possible sources of the tear, counsel for Mr. Voss again established that Ms. Lewis did not mention hitting her knee on the steering wheel column, or twisting it at the time of the accident. Furthermore, the following exchange took place between Mr. Voss' counsel and Dr. Smith regarding the signs of a medial meniscus tear and the absence of any mention or observation of certain symptoms right after the accident or when Ms. Lewis first consulted with Dr. Smith:

Q. But do you believe you would need either an impact of the knee or a twisting of the knee to cause a tear?

A. That's correct.

Q. If there was an impact of the knee you would expect bruising or swelling or some type of observable signs to—it would be more likely than not that you would see something after such an impact, correct?

A. I would agree with you.

The videotape deposition of Dr. Kevin Francis Hanley, who conducted an independent medical evaluation of Ms. Lewis on March 25, 1997, at the request of the defense, was introduced at the trial. Upon examination of Ms. Lewis, Dr. Hanley found "that [Ms. Lewis'] knee was very swollen." The knee contained fluid, was tender, and motion was limited. Furthermore, he stated:

She does have some arthritic change within the knee, as noted in Dr. Smith's evaluation. But apparently, as best we can tell and in asking Ms. Lewis, she had not had any symptoms from the knee prior to that. So as a consequence of this injury, this auto accident, she has aggravated this underlying degenerative process. Unfortunately, it appears that this aggravation is persistent, has become a permanent aggravation, so to speak, because she's still symptomatic when I saw her.

Now Dr. Smith had released her previously and she hadn't been back to him, but it's clear that her knee is not as good as it was when she was released by Dr. Smith. It was still symptomatic. So it's my belief that these residuals that we see, this progression of the degenerative change, is related to the auto accident in the sense that it was set off, flared up, incited, whatever you want to say.

On cross-examination by defense counsel, Dr. Hanley was asked about the Prince George's County Hospital emergency room records for Ms. Lewis. He agreed that nothing in the records reflected "any complaints of pain in the left knee," nor stated that Ms. Lewis "jammed her knee under the dashboard," nor was there any "indication of any swelling or bruising or problems with her left knee." Dr. Hanley and defense counsel had the following exchange regarding the source of Ms. Lewis' knee problem:

Q. Just by looking at the records, without a history from the patient in regards to motor vehicle accident[s], you could not tell just by the records or an examination as to the cause of the injury to distinguish between the degenerative process and the motor vehicle accident?

A. In other words, if you had no history ... ?

Q. Right.

A. Probably not, not in this particular situation.

Q. They'd look about the same?

A. Correct, she presented with effusion and discomfort which could be from an accident or it could be from a degenerative process.

Although Ms. Lewis' MRI showed degenerative changes in her meniscus, Dr. Hanley said: "But that doesn't necessarily mean she also didn't have an acute tear on top of that." He acknowledged, however, that "the degenerative process could result in a tear without trauma," and that Ms. Lewis' MRI showed, on the side of the knee that she had not hit against the steering column, "degenerative changes in the lateral meniscus, without a tear."

Both Dr. Smith and Dr. Hanley based their conclusions, in part, on what Ms. Lewis told them about her accident and her medical history. For example, Dr. Smith agreed that, "other than what [Ms. Lewis] told [him]," he had "no idea what her knee was like before [he] first saw her on September 27th"; and Dr. Hanley relied on Ms. Lewis' declaration that she "jammed" her knee.

Mr. Voss presented no witnesses. Following closing arguments, the jury returned a verdict in Ms. Lewis' favor in the amount of $10,000.00. Ms. Lewis filed a motion for a new trial, contending that: (1) "[t]he jury verdict was contrary to the evidence and the weight of the evidence"; and (2) "[t]he Plaintiff was denied a fair trial by reason of the presence of jurors who should have been removed for cause

and an unrepresentative demographic composition of jurors."[5] After considering the grounds presented by Ms. Lewis in her motion for a new trial, the trial judge concluded that the jury's verdict was not against the weight of the evidence presented regarding her alleged knee injury:

[T]here was evidence in the trial record that plaintiff had had no complaint of injury or pain in her knee, either at the scene of the accident, or during her visit to the hospital emergency room two days after the accident. Further, there was evidence that she had not complained of knee problems to her treating orthopedist, Dr. Smith, until October 4, 1995, about two weeks later. Moreover, the strongest evidence offered by plaintiff to connect the knee injury causally to the accident in question was the testimony, via videotape deposition, of Dr. Hanley, who had seen the plaintiff only once, for about 15–20 minutes, over a year after the accident. The weight of such testimony, already weak in view of these limitations, was further diminished by the fact that the doctor hadn't had the benefit of plaintiff's emergency room records, or the records of the orthopedist who had treated her, when he had written his report and rendered his opinions. Moreover, this doctor's opinion connecting the knee injury to the accident in question was also undermined by evidence of plaintiff having had degenerative changes shown in her MRI, and having had two prior injury claims, which had required prior medical

---

5. With respect to the second issue raised by Ms. Lewis in her motion for a new trial, the trial judge found that "[t]he assertion that the racial composition of the jury rendered her trial unfair is wholly speculative, and based only on the bald assertion of plaintiff's counsel as to [his] presumed prejudices of the majority Caucasian jury against his African American client." Furthermore, the trial court rejected Ms. Lewis' argument that her

"rights were violated by the racial composition of the trial jury as it was comprised," concluding that "a party is entitled to an impartial jury, [which is] 'nothing more than jurors who will conscientiously apply the law and find the facts'" (quoting *Lochart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986)) (other citations and quotations omitted).

treatment by plaintiff's treating orthopedist.

The trial court did not specifically address one argument made by Ms. Lewis, that one of the jurors should have been struck for cause because she had just read a book that discussed "the overwhelming number of silly laws and lawsuits filed in the courts of this country," and because as "a former member of the Montgomery County School Board[, she] had also been a[n] individual defendant in a lawsuit, which litigation had caused her much distress and unhappiness." In a footnote, the trial judge observed that counsel for Ms. Lewis "did not choose to utilize a peremptory strike for [Ms. Hamilton] when exercising his peremptory challenges."

## ANALYSIS

 Ms. Lewis challenges the trial court's denial of her motion for a new trial. "We review the trial court's denial of such motions for an abuse of discretion." *Bernard v. Calkins*, 624 A.2d 1217, 1219 (D.C. 1993) (citing *Jefferson v. Ourisman Chevrolet Co.*, 615 A.2d 582, 585 (D.C.1992); *Barron v. District of Columbia*, 494 A.2d 663, 665 (D.C.1985)). Furthermore,

> When the trial court refuses to disturb a jury's finding of damages, "an appellate court will order a new trial only when the award is so inadequate as to indicate prejudice, passion or partiality on the part of the jury, or where it must have been based on oversight, mistake or consideration of an improper element."

*Bernard, supra,* 624 A.2d at 1219–20 (quoting *Hughes v. Pender*, 391 A.2d 259, 263 (D.C.1978)) (other citations omitted). In light of our standard of review, "the

circumstances are necessarily rare when the trial court's decision upholding the jury verdict will be reversed." *Id.* at 1220.

In this case, defendant stipulated to his liability. Therefore, the jury only determined what damages, if any, should be awarded to Ms. Lewis. The parties' joint pretrial statement showed medical expenses and lost wages for Ms. Lewis amounting to $13,779.40. The jury returned a verdict awarding $10,000.00 in damages to Ms. Lewis. Ms. Lewis contends that the jury verdict was inadequate and resulted from the jury's consideration of improper elements and bias because: (1) defense counsel prejudicially misused prior claims evidence to create the impression that she was a habitual litigant, using the same lawyer and doctor in her claims; and (2) by failing to strike for cause jurors who expressed partiality against plaintiffs.[6]

*The Voir Dire Process*

In the parties' joint pre-trial statement, twenty-two *voir dire* questions were set forth. Prior to the commencement of the jury selection process, counsel for Ms. Lewis requested that at least six of the questions be posed, including the following relating to tort reform:

> Are any of you or your close friends or family members in any organization promoting or favoring legislation to reform the tort system or to limit lawsuits? Do any of you belong to groups or associations which lobby or advocate a change in trial by jury for personal injury claims of any kind or nature? Do any of you, by reason of any newspaper article you may have read, or television coverage you may have seen, hold

---

6. On appeal, Ms. Lewis concedes that her "pre-voir dire challenge to the entire jury panel [on the ground that of the first twenty prospective jurors, only five were African American] admittedly did not meet the standards enunciated in D.C.Code § 11–1910

(1995)," because her counsel failed to challenge the panel "before any individual juror [was] examined," as required by § 11–1910(a). *See generally Epps v. United States*, 683 A.2d 749, 753–54 (D.C.1996).

the belief that frivolous lawsuits are frequently filed?

Do any of you hold the view that our society is simply too litigious, or that our courts are being overused by litigants?

The trial judge declined to pose all of the questions, stating that: "I'm willing to ask something along the lines of do any of you or [your] friends or [family] belong to organizations or groups favoring legislation to reform the tort system or advocating change [in] personal injury trials." Counsel for Ms. Lewis responded: "That's fine." The actual question posed to the prospective jurors was: "Does anyone belong to groups or organizations which promote legislation to reform the tort system or to limit lawsuits for claims for personal injuries. If so, please stand." No juror stood in response to this question.

Later in the jury selection process, Juror No. 477 was called to the bench because she stood in response to the question, "Is any member of the group either a lawyer or someone who has studied law in law school or someone who has worked for lawyers." At the bench, Juror No. 477 asserted that her husband was a lawyer who specialized in "litigation, white collar crime." When asked if she had "any impressions or opinions about lawsuit[s] or personal injury claims that [she] thought would affect her ability to be a fair juror," she mentioned a Maryland lawsuit against an independent school board which she chaired:

> Well, I must admit[ ] I just recently retired as the chairman of the independent school board. This independent school was sued last year and we went through a trial, and I do have some views about—generally speaking—how the tort system might benefit from an overhaul based on my experience with this particular case.

The juror admitted that she had "negative feelings" about that experience and that it was "very unpleasant." The trial judge commented:

> What you're describing, of course, is a very different kind of case than what we have here. Here we have an auto collision where liability is conceded and the only issue is what damages, if any, the plaintiff is entitled to receive as a result of injuries, and you would be required to evaluate.

> Do you think your feelings about the personal experience you had in that other kind of case would come into ... play in your evaluating the evidence fairly in this case?

Juror No. 477 replied: "No, I don't think that that particular experience alone" would have an impact. She added that she had done some reading about personal injury law. She singled out the book, THE DEATH OF COMMON SENSE and stated:

> I do think that generally speaking in this country we ... tend to assign blame or seek some reason or someone else to ... help us out when we've run into a tough situation.

> [I] can certainly serve and I think be an impartial, fair judge of the events.... But ... clearly, the events would have to be pretty straight forward in order for me to—I'm not going to give someone the benefit of the doubt just based on—

The trial judge interrupted Juror No. 477, saying:

> Well, and of course, the plaintiff in a case has the burden of proof.... So we won't be asking you to give her the benefit of the doubt. What we would be asking is that you treat each witness fairly ... and fairly evaluate the evidence. I just want to make sure that you're not thinking that you would treat the plaintiff's witnesses differently because they were plaintiff's witnesses.

Juror No. 477 replied: "No, I don't think so.... No."

Counsel for Ms. Lewis moved to strike Juror No. 477 for cause, saying, in part:

The reason being that I don't expect anybody to stand up at this bench and say that they're going to be unfair, but I am—I do view skeptically the two things; the book she read, THE DEATH OF COMMON SENSE ... had to do with all kinds of frivolous lawsuits.

This is a much reviewed book. I read a review in the New York Times in the book review sections. It is ... very much a whitewash type of story in which they're making everybody look like every case is filed as [a] McDonald's coffee case.

Secondly, just by the words she used—... couldn't give [plaintiff] the benefit of the doubt, I think that logically she's going to hold to a very high standard because of her own experience and ... because of the book that she's read....

I just think the woman is trying to be honest. Wants to be fair, but the truth of the matter is that ... the nature of her exposure is such—both the reading material she uses and the personal experience as a defendant and having her own competency tested, I think she could identify with the defendant and hold the plaintiff to an unfair burden....

The trial judge refused to strike Juror No. 477 because Ms. Lewis' case was different from that in which the juror was a defendant, and because the judge was satisfied that, despite the juror's reading about personal injury litigation, she could be "impartial and fair."

Counsel for Ms. Lewis also expressed concerns about Juror No. 189's ability to be fair and impartial. Indeed, defense counsel insisted that Juror No. 189 should be struck for cause because his work on tort reform "potentially taints his ability to be a fair juror." However, the trial judge also refused to strike Juror No. 189 for cause. This juror was a retired Assistant Corporation Counsel of the District who had "worked on tort reform law," preparing legislative bills, "over a period of some eight years." He "was a little bit disappointed" that the District was not successful in getting a tort reform bill enacted, but he declared: "that's neither here nor there in this case as I see it. I just have to follow the law, whatever it is now." He added, "unless there was some egregious reaching on somebody's part either denying ... or claiming, it wouldn't affect me one way or the other."

Counsel for Ms. Lewis was given three peremptory challenges. He used all three, including one to strike Juror No. 189. On appeal, Ms. Lewis argues that her counsel could not strike Juror No. 477 because he had no peremptory challenges left. The record shows that Juror No. 477 was seated after both counsel had completed their peremptory challenges.[7]

We turn now to the applicable legal principles concerning the jury selection process. "The [constitutional Seventh Amendment] right to a jury trial in a civil case would be illusory unless it encompassed the right to an impartial jury." *Skaggs v. Otis Elevator Co.*, 164 F.3d 511, 514–15 (10th Cir.1998). Furthermore, "[t]hough the Constitution guarantees only a fair and impartial jury, free from actual bias or prejudice, 'a juror's impartiality may not be assumed without inquiry.' [ ] The proper occasion for such determination is upon the *voir dire* examination."

7. The trial judge instructed counsel to make all of their peremptory challenges at the same time, and indicated that they could "strike from the panel [because] [w]e need to do it all at once...."

*McCoy v. Goldston,* 652 F.2d 654, 657 (6th Cir.1981) (quoting *Kiernan v.. VanSchaik,* 347 F.2d 775, 778 (3d Cir.1965)). We have said previously that, "[t]he trial court has broad discretion in conducting *voir dire* ... and its rulings will not be disturbed on appeal 'absent an abuse of discretion and substantial prejudice to the accused....' " *Jenkins v. United States,* 541 A.2d 1269, 1272 (D.C.1988) (quoting *Cordero v. United States,* 456 A.2d 837, 841 (D.C.1983)) (other citation and internal quotations omitted). Nonetheless, "the trial court's discretion over the conduct of [the] *voir dire* is subject to 'the essential demands of fairness.' " *Id.* (quoting *Cordero, supra,* 456 A.2d at 841) (other citations and internal quotations omitted).

We recently stressed the important role of the trial judge in detecting bias on the part of potential jurors. *See Doret v. United States,* 765 A.2d 47, 56 (D.C.2000) (" '[V]oir dire ... to be meaningful, must uncover more than the jurors' bottom line conclusions [to broad questions], which do not in themselves reveal automatically disqualifying biases as to their ability fairly and accurately to decide the case, and indeed, which do not elucidate the bases for those conclusions ....") (quoting *Dingle v. State,* 361 Md. 1, 759 A.2d 819, 826 (2000)) (internal quotations omitted). Ferreting out bias may pose difficulties because, as the court recognized in *Malvo v. J.C. Penney Co., Inc.,* 512 P.2d 575 (Alaska 1973):

> People do not readily admit to bias, states of mind that prevent the rendering of a just verdict or opinions which would improperly influence their verdicts. Generally it is only from nuances derived from the jurors' testimony that a judge may ascertain whether grounds for such challenges for cause exist.

*Id.* at 583. *See also Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (in matters of public interest, "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case"). Given the reluctance to admit to bias, " '[t]he constitutional demand for trial by an 'impartial jury' casts upon the judiciary the exercise of judgment in determining the circumstances which preclude the free, fearless and disinterested capacity in analyzing evidence which is indispensable if jurymen [and jurywomen] are to deal impartially....' " *Hughes v. United States,* 689 A.2d 1206, 1207 (D.C. 1997) (quoting *Dennis v. United States,* 339 U.S. 162, 181, 70 S.Ct. 519, 94 L.Ed. 734 (1950)) (Frankfurter, J., dissenting).

We turn now to the application of the above referenced legal principles to the case before us. Contrary to our dissenting colleague's assertion, under the applicable standard of review, our opinion does not "amount[ ] to a holding that the trial judge erred by believing, rather than disbelieving Juror No. 477's representations under oath." Rather, our conclusion is grounded in case precedent, and is premised on the reluctance of a person to admit bias, Juror No. 477's ambiguous claim of impartiality, and the absence of follow-up questions by the trial judge to eliminate the ambiguity and to ensure impartiality. Moreover, in arguing that Ms. Lewis "failed to suggest further *voir dire* questions in the trial court," our dissenting colleague loses sight of the fact that Ms. Lewis requested that the trial court pose at least six specific questions, four of which specifically related to tort reform. The trial court declined to pose the requested questions, choosing instead to fashion a broad question concerning organizational membership.

█ In the case before us, similar to the juror in *Hughes, supra,* a case in which we reversed the judgment of the trial court due to manifestations of partiality by a juror and the trial court's refusal to strike

that juror, Juror No. 477 signaled doubts as to whether she could be fair and impartial, particularly based upon her reading of a book concerning frivolous lawsuits and her "very unpleasant" experience as a defendant in a lawsuit. She held views as to "how the tort system might benefit from an overhaul." Moreover, she believed that people "in this country ... tend to assign blame ... or seek someone else to ... help us out when we've run into a tough situation." The trial court sought to reassure Juror No. 477 that this case was different from the one in which she became a defendant. When the trial judge pressed the juror as to whether she would treat the plaintiff's witnesses differently because they were the plaintiff's witnesses, she said: "No I don't think so. No." The trial court asked no additional questions to clarify the juror's response, and to make certain that she would not sit as a partial juror. Since " '[i]mpartiality is not a technical conception[, but] is a state of mind,' " *Hughes, supra,* 689 A.2d at 1208 (quoting *Dennis, supra,* 339 U.S. at 172, 70 S.Ct. 519), based upon the record before us, the trial judge erred in accepting Juror No. 477's ambiguous claim that she could be impartial.

██ We also conclude that the decision of the trial court to accept Juror No. 477's ambiguous claim that she could be impartial despite her "very unpleasant" experience as a defendant in a lawsuit, and her attitudes toward tort reform and plaintiffs, did not constitute harmless error. In fact, the trial court's decision resulted in substantial prejudice to Ms. Lewis who had only three peremptory challenges, all of

which were used, and one of which was directed to Juror No. 189 who had engaged in tort reform activities for eight years as an Assistant Corporation Counsel. Significantly, the damages verdict rendered by the jury was less than the actual medical expenses ($7269.00)[8] and lost wages ($6510.40) that were uncontested at trial.[9]

Although the trial court, in denying Ms. Lewis' motion for a new trial, pointed to the cross-examination of Doctors Smith and Hanley, and portrayed the testimony of the doctors as "weak" and further questioned Dr. Hanley's testimony, the jury clearly gave the doctor's testimony significant weight with respect to the proximate cause of Ms. Lewis' injuries, given its $10,000.00 verdict in the face of $13,779.40 in medical expenses and lost wages. Thus, the record on appeal suggests a nexus between potential juror bias, due to considerations other than the evidence presented at trial, and the $10,000.00 jury verdict which is less than Ms. Lewis' special damages, and which is unexplainable on the record before us.

*The Claims–Minded Plaintiff Issue*

Ms. Lewis also cites, as reversible trial error, the decision of the trial court to overrule her objection to a part of the closing argument of Mr. Voss which referred to prior personal injury claims by Ms. Lewis. Specifically, Ms. Lewis argues that: "The trial court erred in permitting defense counsel, over objection in closing argument, to misuse prior claims evidence prejudicially attacking the appellant as a habitual litigant who conspired

---

**8.** The medical expenses do not include Dr. Hanley's fee. He was paid by defense counsel.

**9.** The record does not reflect the amount of medical expenses attributable to each of Ms. Lewis' separate injuries, including her neck and her knee. However, she received sub-

stantial treatment and care relating to her knee, including an x-ray on October 4, 1995, followed by physical therapy; an MRI on October 27, 1995; arthroscopic surgery on December 12, 1995, physical therapy in 1996; and cortisone steroid injections recommended in March 1996.

with appellant's counsel and her attending orthopedist to perpetrate a fraud, where the defense had offered no evidence of fraudulent conduct."

During the cross-examination of Ms. Lewis, she acknowledged that she was involved in a bus accident in 1989 and that her current counsel had filed a claim in her behalf against the Washington Metropolitan Area Transit Authority ("WMATA"). Neither the questions of opposing counsel, nor the responses of Ms. Lewis, suggested that her claim against WMATA was meritless. Ms. Lewis also stated, in response to cross-examination questions, that in 1990 she injured her finger and was represented in a claim for damages by her current counsel. Again, no questions or responses even implied that her claim for her finger injury lacked merit. Yet, while delivering her closing argument, counsel for Mr. Voss told the jurors:

> The other type of analysis you will do also concerns the credibility of each of the witnesses. Ms. Lewis believes and claims that all her problems are related to this one incident despite the fact that she had significant preexisting arthritis in the knee, in other parts of her body and other problems.[10]

> She's made several claims before in the past. That's part of the evidence to consider. Does she have an interest or motive—

Counsel for Ms. Lewis objected. During the bench conference, he challenged counsel's argument regarding a "claims-minded" plaintiff. When reminded that he had not objected to Ms. Lewis' testimony concerning her prior claims, he indicated that he "thought [such testimony] was admissible" because of Ms. Lewis' prior neck injury, but that the admission did not "open up the ... door" to the claims-minded plain-

tiff argument. The trial judge ruled that, "there is [no] foundation for arguing that the evidence shows there is anything suspect just because she had a prior claim," but that the prior claim for her neck injury was "relevant to her condition physically." Nonetheless, the trial judge refused to strike anything counsel for Mr. Voss said prior to the bench conference. When counsel for Ms. Lewis reminded the trial judge that Mr. Voss' counsel had "argu[ed] that [Ms. Lewis] had an interest in the outcome of this case by reason of having been a claimant before," the court adhered to its refusal to strike any part of the closing argument.

After the bench conference, counsel for Mr. Voss referred to Ms. Lewis' representation on two previous occasions by her current counsel, and her treatment on one of those occasions by Dr. Smith. Counsel then questioned the credibility of Dr. Smith on the ground that he was a paid expert. Furthermore, counsel implied that Dr. Hanley was not an objective witness because he and Dr. Smith were "colleagues in the same area."

■ "The charge of litigiousness is a serious one, likely to result in undue prejudice against the party charged, unless the previous claims made by the party are shown to have been fraudulent." *Outley v. City of New York*, 837 F.2d 587, 592 (2d Cir.1988) (citing MCCORMICK ON EVIDENCE § 196, at 578–81 (3d ed.1984)); 3A J. WIGMORE, EVIDENCE §§ 963, 981 (Chadbourn rev.1970). "[While] litigiousness may have some slight probative value, ... that value is outweighed by the substantial danger of jury bias against the chronic litigant. The trial court has a duty to prevent exploitation of this prejudice...." *Id.* (quoting

---

10. This argument is analogous to a statement made by Juror No. 477 during the jury selection process: "[G]enerally speaking[,] in this country we ... tend to assign blame or seek some reason or someone else to ... help us out when we've run into a tough situation."

*Raysor v. Port Auth.*, 768 F.2d 34, 40 (2d Cir.1985)) (other citation omitted).

■ By allowing counsel for Mr. Voss to suggest, without a factual predicate showing fraud or frivolous complaints, that, because of two prior claims, Ms. Lewis had a "motive" or "interest" to file suit against Mr. Voss, the trial court did not adequately guard against juror prejudice against Ms. Lewis. This is particularly true since the theme of Mr. Voss' closing argument was the credibility of Ms. Lewis, Dr. Smith and Dr. Hanley, and since the testimony of Dr. Smith and Dr. Hanley depended, at least in part, on what Ms. Lewis recounted to them about the accident and her medical history.

Our dissenting colleague's reliance on *Murphy v. Bonanno*, 663 A.2d 505 (D.C. 1995) is misplaced. *Murphy* is quite different from the case before us.[11] There, in a cross-examination context, we were concerned about the trial judge's "categorical exclusion" of evidence relating to the " 'litigious' or claim-minded" plaintiff. *Id.* at 510. However, we were careful to distinguish between the trial judge's determination of relevance, and the exercise of discretion regarding admissibility.[12] We made clear that the exercise of discretion involves ascertaining whether the person asserting litigiousness "ha[s] an adequate 'factual predicate' for the proffered questions...." *Id.* The danger of an inadequate factual predicate is that some questions are "of a kind that, if hurled into the

proceedings recklessly, could work unfair prejudice...." *Id.* The same may be said for a closing argument based upon an inadequate factual predicate. Furthermore, we stated in *Murphy* that:

appellant's factual proffer with respect to the assertedly bogus insurance claims was fairly specific (except as to dates), including the precise amounts recovered by his wife. On the other hand, the assertion that Ms. Murphy lured the doctor to her apartment to lay the ground for a false claim of sexual harassment and extort a settlement might turn out, on minimal examination, to rest on mere conjecture from the fact that the parties compromised the debt.

*Id.* at 511.

In the case before us, as indicated, Ms. Lewis objected to part of Mr. Voss' closing argument which was designed to show that she conspired to file prior fraudulent claims. The trial judge concluded that there was no factual predicate showing anything suspect about her prior claims. Since there was no factual predicate, the argument should have been excluded. It was not, and as we have shown, prejudiced Ms. Lewis. In sum, the trial judge abused her discretion by failing to strike the challenged portion of Mr. Voss' closing argument.

■ Accordingly, for the foregoing reasons, we are constrained to conclude that the trial court abused its discretion by

---

11. Mrs. Murphy and Ms. Bonanno filed a complaint against Mr. Murphy, alleging assault and battery, false arrest, and other torts. He lodged a counterclaim for false arrest, malicious prosecution and conversion. The trial judge, on relevance grounds, refused to permit Mr. Murphy to conduct cross-examination into prior claims filed by Mrs. Murphy. Mr. Murphy proffered evidence that Mrs. Murphy "submitted a 'false and fraudulent' claim with an insurance company ....;" and, in another matter, threatened a doctor with a

sexual harassment and sexual assault lawsuit, if he did not settle a $50,000 debt she owed to him.

12. We declared that: "[A] finding of relevance by no means exhausts the question of admissibility. Because the trial judge erroneously barred the cross-examination on relevance grounds, however, he never exercised the discretion he retained to admit, exclude, or limit the questioning...." *Id.* at 510.

denying Ms. Lewis' motion for a new trial. *See Bernard, supra,* 624 A.2d at 1219 (citing *Jefferson, supra,* 615 A.2d at 585). Therefore, we reverse the trial court's judgment and remand this matter, with instruction to grant Ms. Lewis a new damages trial.

*So ordered.*

SCHWELB, Associate Judge, dissenting:

I am unable to agree with my colleagues that reversal is warranted in this case. In my view, the trial judge's finding that Juror No. 477 could be impartial was not clearly erroneous, and the judge did not abuse her broad discretion in declining to disqualify this prospective juror for cause. I am also satisfied that the judge committed no error, and certainly no reversible error, in overruling an objection to a very brief portion of defense counsel's closing argument. I would affirm the judgment.

## I.

The question whether a prospective juror who has been challenged for cause will be able to perform her duties impartially is one of fact, and the trial judge's determination must therefore be accorded great deference on appeal. *Patton v. Yount,* 467 U.S. 1025, 1036–38, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984).[1] A finding of impartiality may be overturned only for "manifest error." *Id.* at 1031, 104 S.Ct. 2885 (quoting *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)) (quotation marks omitted); *accord, Reynolds v. United States,* 98 U.S. 145, 157, 25 L.Ed. 244 (1878); *Harris v. United States,* 606 A.2d 763, 764 (D.C.1992); *Rease v.. United States,* 403 A.2d 322, 326 (D.C.1979) (per curiam). The burden of showing partiality rests squarely upon the challenger. *Rease, supra,* 403 A.2d at 325. Moreover, as my colleagues recognize, "the trial court has broad discretion in conducting *voir dire* [,] and its rulings will not be disturbed on appeal absent an abuse of discretion and substantial prejudice to the [appellant]." Maj. op. at 1005 (citations and ellipsis omitted). "The determination of a potential juror's impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge." *Rease, supra,* 403 A.2d at 325 (quoting *Ristaino v. Ross,* 424 U.S. 589, 595, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976)) (internal quotation marks omitted). In this case, Juror No. 477 was not "manifestly" biased, and, in my opinion, the majority's reversal of the trial judge's decision cannot be reconciled with our deferential standard of review as described above.

The record reflects that Juror No. 477 spoke openly, and with apparent candor, during her interrogation on *voir dire.* She volunteered that, in her opinion, "the tort system might benefit from an overhaul."[2] She also disclosed that she had read The Death of Common Sense, a book that Ms. Lewis' attorney regarded as unduly critical of tort and personal injury plaintiffs. These disclosures may not have made No. 477 appear to be an ideal juror from Ms. Lewis' perspective, but they were not grounds for automatic disqualification. Any possible partiality suggested by the prospective juror's responses was not at all "manifest," as the cases require. At most,

---

**1.** As Justice Powell stated for the Court in *Patton, supra,* the question whether a potential juror can serve impartially

is not one of mixed law and fact. Rather it is plainly one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the

evidence, and should the juror's protestation of impartiality have been believed.

467 U.S. at 1036, 104 S.Ct. 2885 (citation omitted).

**2.** No. 477 based this opinion on her experiences in a case in which a school district with which she had been connected had been sued.

the inference that someone with Juror No. 477's views would not be fair to the plaintiff was hypothetical—a possibility, perhaps, but hardly a certainty. That is not enough to permit appellate second-guessing. As the Supreme Court explained in *Reynolds, supra,*

> if hypothetical only, the partiality is not so manifest as to necessarily set the juror aside. Mr. Chief Justice Marshall, in *Burr's Trial* (1 Burr's Trial, 416), states the rule to be that "light impressions, which may fairly be presumed to yield to the testimony that may be offered, which may leave the mind open to a fair consideration of the testimony, constitute no sufficient objection to a juror; but that those strong and deep impressions which close the mind against the testimony that may be offered in opposition to them, which will combat that testimony and resist its force, do constitute a sufficient objection to him."

98 U.S. at 155; *see also Rease, supra,* 403 A.2d at 326. Juror No. 477's comments might perhaps have suggested some philosophical leanings which could operate to the advantage of the defense, although even that possibility was hardly obvious or manifest. Under the authorities cited, there was no ground for reversal.

The trial judge recognized that Juror No. 477's responses did warrant further inquiry regarding the woman's ability to be fair to both parties. The judge therefore followed up by propounding several more specific questions. In response, the prospective juror stated, *inter alia,* that she could "certainly serve and, I think, be an impartial, fair judge of the events and so forth." [3] Asked whether she would treat the plaintiff's witnesses differently

because they were plaintiff's witnesses, she responded "No, I don't think so." Satisfied with these assurances, the judge rejected the plaintiff's challenge for cause and explained her reasons for doing so:

> Clearly, I was concerned when [Juror No. 477] described what she seemed to feel as a negative experience in her being involved in a lawsuit against the school she chaired the board at.
>
> When I distinguished significantly between that kind of case and this kind, she seemed to understand that there really wasn't much of an overlap in her own—between the nature of these claims.
>
> Her personal opinion, her reading in the area, I'm satisfied with her description of her ability to be impartial and fair is a reasonable one. I don't see a big overlap with her personal case and this one. I don't think that we have a basis other than speculation in which to strike her for cause.

Obviously, the trial judge's ruling on the plaintiff's challenge to this prospective juror turned primarily on her assessment of the woman's responses. Juror No. 477 stated, under oath, that she could be an impartial and fair judge of the facts. If this statement was true, then there was no basis for a challenge for cause. In the final analysis, it was the judge's responsibility to decide whether, given the entire record, the prospective juror's assurance was believable. *See Patton, supra,* 467 U.S. at 1036, 104 S.Ct. 2885. The judge did her duty, inquired further, and considered all of the prospective juror's answers. In the end, the judge credited Juror No. 477's "description of her ability to be impartial and fair." This, as I have noted,

---

3. Juror No. 477 added that "the events would have to be pretty straight forward in order for me to—I'm not going to give someone the benefit of the doubt just based on—." The judge explained that the plaintiff had the burden of proof and "[s]o we won't be asking you to give her the benefit of the doubt." Juror No. 477 responded: "Right."

was a finding of fact. Under the applicable standard of review, such a finding is insulated from assertive appellate second-guessing unless it is manifestly erroneous. *Patton, supra,* 467 U.S. at 1031, 104 S.Ct. 2885; *cf.* D.C.Code § 17–305(a) (1997).

Although my colleagues in the majority do not phrase their ruling in this way, their decision, when assessed under the "manifest error" standard of review, amounts to a holding that the trial judge erred by believing, rather than disbelieving, Juror No. 477's representations under oath. It is there that they and I part company. Over several pages of transcript, the judge and the prospective juror participated in a thoughtful dialogue. The judge had the obvious advantage of being able to look the woman in the eye, to observe her demeanor and mannerisms, and to consider her tone and emphasis in responding to questions. *See Rease, supra,* 403 A.2d at 325 (emphasizing the importance of the trial judge's ability to assess a prospective juror's demeanor). By marked contrast, we, as an appellate court, have access only to the transcript—to the whole transcript, to be sure, but to nothing but the transcript. "The best and most accurate record is like a dehydrated peach; it has neither the substance nor the flavor of the fruit before it was dried." *Morris v. United States,* 728 A.2d 1210, 1215 (D.C. 1999) (quoting *Broad. Music, Inc. v. Havana Madrid Restaurant Corp.,* 175 F.2d 77, 80 (2d Cir.1949) (Jerome Frank, J.)) (quoting ULMAN, THE JUDGE TAKES THE STAND 267 (1933)). Where, as in this case, the merits of the plaintiff's challenge for cause turn almost entirely on the prospective juror's demeanor and credibility, an appellate court, in my view, may not sub-stitute its judgment for that of the trial judge.

Judge Reid points out, and I agree, that "[p]eople do not readily admit to bias." Maj. op. at 1005 (citation omitted). This is a fundamental fact of life with which any experienced judge is undoubtedly familiar. A prospective juror's representation that she can and will be fair therefore is not, and cannot be, binding on the trial judge. The judge must use his or her own judgment and worldly wisdom to determine whether or not the prospective juror is being truthful, or whether the juror has biases of which he or she may not be aware. But we do not have the slightest reason to believe that the experienced judge in this case was unable to appreciate the reluctance on many people's part to acknowledge their own prejudices. The fact that the judge believed *this* prospective juror, after receiving her responses during *voir dire,* does not suggest that the judge would automatically credit *every* self-serving declaration that might be presented to her by someone the judge regarded as less trustworthy. Indeed, the judge sustained the plaintiff's challenge for cause against another prospective juror—a former law clerk to a Superior Court Judge—on a record which, at least on paper, would have justified the woman's retention on the jury.[4]

I agree with the majority that the trial judge plays an important role in detecting bias on the part of potential jurors. Maj. op. at 1005 (citation omitted). I likewise have no quarrel with my colleagues' view that

> voir dire ... to be meaningful, must uncover more than the jurors' bottom

---

4. This occurrence illustrates the problem with appellate intervention in cases in which the pros and cons of a challenge for cause are evenly balanced. In the present case, application of a non-deferential standard of review

might entitle each party to reversal on the basis of the judge's ruling on a challenge for cause if the jury's verdict ultimately went against that party!

line conclusions [to broad questions], which do not in themselves reveal automatically disqualifying biases as to their ability fairly and accurately to decide the case, and indeed, which do not elucidate the bases for those conclusions.

*Id.* (citation omitted, ellipsis and alteration in original). But in this case, there was a specific dialogue between the prospective juror and the judge. At the conclusion of this exchange, Ms. Lewis' attorney did not propose any additional questions to be propounded to the prospective juror, nor did he seek leave to interrogate Juror No. 477 himself. Instead, he asked the judge, *on the basis of the record as it then stood,* to disqualify No. 477 for cause. Having failed to suggest, in the trial court, further *voir dire* questions focused upon Juror No. 477's qualifications,[5] Ms. Lewis cannot now be heard to complain, for the first time on appeal, that no further interrogation of this prospective juror was conducted. *See, e.g., In re A.R.,* 679 A.2d 470, 477–78 & n. 11 (D.C.1996).

## II.

The majority also holds that a new trial is required because the trial judge overruled an objection by Ms. Lewis' attorney to a very brief portion of defense counsel's closing argument by Mr. Voss' attorney. According to my colleagues, the comments to which objection was made constituted an improper "claims-minded plaintiff" argument. In my opinion, the relevant portion of counsel's closing was based on evidence that had been received without objection, and the argument was not improper. Even assuming, *arguendo,* that the objection should have been sustained, reversal is not warranted.

During her cross-examination by counsel for Mr. Voss, Ms. Lewis was asked about two prior accidents in which she had been involved. She acknowledged that she had made a claim following each of these events, that her attorney in the present case had represented her in each, and that in one instance, she had been evaluated by the physician who testified on her behalf against Mr. Voss. Ms. Lewis' attorney did not object to this cross-examination,[6] and the evidence became a part of the record.

During her closing argument, Mr. Voss' attorney referred briefly to the injuries suffered by Ms. Lewis in her previous accident. Counsel then continued as follows:

Ms. Lewis believes and claims that all her problems are related to this one incident despite the fact that she had significant preexisting arthritis in the knee, in other parts of her body and other problems.

The cyst, the osteo—tricompartmental osteoarthritis. And the doctors agree those are not all related, but despite that everything now is related to this one incident.

*She's made several claims before in the past. That's part of the evidence to*

5. Earlier, as the majority points out, counsel for Ms. Lewis did ask that certain additional questions be posed to the entire venire on *voir dire.* This was quite different, however, from proposing specific follow-up questions to be propounded to this particular juror on the basis of her prior answers. In any event, we have held that a trial court has broad discretion in conducting *voir dire,* and the judge was not required to pose questions in the precise language proposed by Ms. Lewis' attorney where, as here, the judge's own inqui-

ries to the prospective jurors addressed the issues sought to be explored by counsel. *See Cordero v. United States,* 456 A.2d 837, 841 (D.C.1983).

6. Counsel later explained to the court that he believed the evidence to be admissible because his client had suffered injury to her neck in one of the earlier cases as well as in the accident that precipitated the present case.

*consider. Does she have an interest or motive—.*

(Emphasis added.) Before defense counsel could finish the last sentence and identify the alleged "interest or motive," Ms. Lewis' attorney objected, complaining at the bench that the foregoing constituted an improper "claims-minded plaintiff" argument.

The only objection made by the plaintiff on "claims-mindedness" grounds was to the two brief sentences plus seven words that I have italicized above. The judge pointed out that the evidence had been received without objection, and she ruled that counsel's argument to that point therefore had not been out of order. The judge added, however, that the defense did not "have a foundation laid that suggests that credibility is at issue because of prior claims."[7] On this limited record, the majority apparently concludes that the closing argument made by Mr. Voss' counsel warrants reversal of the judgment.

I turn first to the merits of the plaintiff's objection. The majority relies on general statements in two decisions of the United States Court of Appeals for the Second Circuit.[8] Maj. op. at 1007. But ten years after the earlier of these Second Circuit

cases, and seven years after the later one, this court reiterated that

> the courts of the District of Columbia are notably liberal in receiving evidence of claim-mindedness and allowing the jury to assess its weight. Decisions binding on us firmly indicate the relevance of such evidence to assessing the truth of the witness' present allegations.

*Murphy v. Bonanno,* 663 A.2d 505, 510 (D.C.1995) (internal citations and quotation marks omitted).[9]

In *Murphy, supra,* this court relied on, and cited with approval, *Mintz v. Premier Cab Ass'n, supra* note 9. 663 A.2d at 510. *Mintz* involved a scenario similar to the one now before us. In that case, the plaintiff, a passenger in a taxi, sued the taxicab company for injuries sustained in a collision between two cabs. On cross-examination, the plaintiff was interrogated regarding claims that she had made following her involvement in two prior accidents. In closing argument, counsel for the defendant challenged the plaintiff's credibility upon the ground that she was "claims-minded." *Mintz,* 75 U.S.App. D.C. at 389, 127 F.2d at 745. There was no evidence that the plaintiff's earlier claims were fa-

---

7. Following the judge's ruling, Mr. Voss' attorney reminded the jury that Ms. Lewis "was treated by the same doctor as to one of those injuries," and she invited the jurors to consider the doctor's credibility. There was no further objection.

8. *Outley v. New York,* 837 F.2d 587, 592 (2d Cir.1988); *Raysor v. Port Auth.,* 768 F.2d 34, 40 (2d Cir.1985).

9. The *Murphy* case was decided one month and fourteen days before the accident that precipitated the present litigation. The liberality of the courts of this jurisdiction with respect to evidence of claim-mindedness, to which we referred in *Murphy, supra,* has also been explicitly noted in a leading commentary:

> The courts in the District of Columbia go to the other extreme. They have said that whenever there have been other claims, it is up to the jury to decide whether the claimant is "unlucky or claim-minded." *Mintz v. Premier Cab Association,* [75 U.S.App. D.C. 389, 390,] 127 F.2d 744, 745 (1942) (cross-examination of plaintiff about two prior personal injury claims); *Manes v. Dowling,* 375 A.2d 221, 223 (D.C.1977) (evidence of four subsequent personal injury claims admissible even though only one was of another parking lot accident); *Evans v. Greyhound Corp.,* 200 A.2d 194, 196 (D.C.1964) (proper to cross-examine plaintiff suing for a fall while a passenger aboard a bus about two previous settled claims).

> McCormick on Evidence § 196 at 580 n. 10 (Edward W. Cleary ed., 3d. ed.1984) (format of citations altered).

bricated or false. The trial judge nevertheless permitted the defense argument. Thereafter, in a unanimous opinion written by Judge Edgerton, the United States Court of Appeals affirmed a judgment favorable to the defendant:

> This type of evidence, like many other types, may create prejudice but is believed to be worth more than it costs.[10]

> This case is within the principle. Negligent injury is not unusual, but it is unusual for one person, not engaged in hazardous activities, to suffer it repeatedly within a short period and at the hands of different persons. The court's rulings were therefore right. That all three of appellant's stories may have been true affects the weight of the evidence, not its admissibility. It was for the jury to decide from all the evidence, and from its observation of appellant on the stand, whether she was merely unlucky or was "claim-minded."

*Id.*, 75 U.S.App. D.C. at 390, 127 F.2d at 745.[11]

In light of these authorities, it cannot fairly be said that the challenged portion of defense counsel's closing argument was contrary to District of Columbia law. A careful reading of what Mr. Voss' attorney actually said (as distinguished from what opposing counsel obviously apprehended that she might say) reveals that the "claims-minded plaintiff" theme, if it emerged at all, was implicit rather than explicit—counsel asked rhetorically whether the plaintiff had an "interest" or "motive." *Murphy, supra,* and *Mintz, supra* note 9, as well as other decisions surveyed in *Murphy,* would have permitted a far more direct articulation of the theory than defense counsel ever attempted.

I should think that if my colleagues share Justice Ginsburg's discomfort with *Mintz* and with *Mintz's* District of Columbia progeny, see note 9, *supra,* then our court should address the problem directly, *en banc.* In the meantime, however, we are required to follow binding precedent. Even if one were to construe the holding in *Mintz* as inconsistent with the later decision in *Roundtree, supra* note 11, which it is not, *Mintz* would control. "Where a division of this court fails to adhere to earlier controlling authority, we are required to follow the earlier decision rather than the later one." *Thomas v.*

---

**10.** The statement in *Mintz,* 75 U.S.App. D.C. at 390, 127 F.2d at 745, that "[t]his type of evidence ... is believed to be worth more than it costs," is directly contrary to the views of the United States Court of Appeals for the Second Circuit in *Raysor, supra* note 8, 768 F.2d at 40. See Maj. op. at 1007. The court there stated that "litigiousness may have some slight probative value, but that value is outweighed by the substantial danger of jury bias against the chronic litigant." *Raysor, supra* note 8, 768 F.2d at 40. The majority relies heavily on *Raysor,* but *Mintz* constitutes controlling authority, see note 11, *infra,* while *Raysor* does not.

**11.** *Mintz* was decided more than twenty eight years before February 1, 1971, and its holding is therefore binding on this court. *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971). In *Roundtree v. United States,* 581 A.2d 315, 325–26 (D.C.1990), a divided panel of this court declined to follow dictum in *Mintz* which appeared to approve the cross-examination of a complaining witness in a sexual assault case regarding other unrelated sexual assault charges that the witness had made on previous occasions against various other men. But the division of this court that decided *Roundtree* was not empowered to, and did not purport to, overrule the holding of *Mintz* with respect to the relevance of a plaintiff's claim-mindedness in civil litigation. *Cf. Hemphill v. Washington Metro. Area Transit Auth.,* 299 U.S.App. D.C. 184, 185–86, 982 F.2d 572, 573–74 (1993) (per curiam) (Ruth Bader Ginsburg, J., concurring in the judgment) (criticizing *Mintz* as a decision "of a certain age"). *Murphy, supra,* in which the claims-minded plaintiff theory was declared to be alive and well, at least in civil cases, was decided after both *Roundtree* and *Hemphill.*

*United States,* 731 A.2d 415, 420 n. 6 (D.C. 1999).

But even if the plaintiff's objection to the defendant's closing argument had been well-taken—and, for the reasons that I have stated, I am convinced that it was not—reversal would still be unwarranted. The jury, as I have noted, was well aware that Ms. Lewis had made two prior accident claims, that her attorney was involved in both of them, and that the doctor who testified on her behalf at the trial in this case had been consulted in one of the two. This testimony was admitted without objection. Counsel for Ms. Lewis never moved to strike this evidence, nor did he request a limiting instruction regarding the purpose for which the jury could consider it. During the trial, the only objection made by Ms. Lewis' attorney regarding the issue now under discussion was to the two short completed sentences and one short incomplete sentence in defense counsel's closing that are quoted and italicized on page 1012, *supra.* It takes quite a stretch to construe these twenty-four words [12] as a "claims-minded plaintiff" argument. But even if counsel's remarks are so interpreted, the probability that an attorney's very cryptic comment (about facts well-known to the jury) appreciably affected the result of a three-day trial is surely somewhere between negligible and nil.

### III.

In a civil case, as in a criminal prosecution,

> [t]he reversal of a [judgment] entails substantial social costs: it forces jurors, witnesses, courts, [counsel], and the [parties] to expend further time, energy, and other resources to repeat a trial that has already once taken place; [parties or witnesses] may be asked to relive

their disturbing experiences. The "passage of time, erosion of memory, and dispersion of witnesses may render retrial difficult, even impossible." ... These [and other] societal costs of reversal and retrial are an acceptable and often necessary consequence when an error in the first proceeding has deprived a [party] of a fair determination of the [merits]. But the balance of interest tips decidedly the other way when an error has had no effect on the outcome of the trial.

*United States v. Mechanik,* 475 U.S. 66, 72, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986) (phrases in brackets inserted to replace criminal case terminology; internal citations omitted). In my opinion, Ms. Lewis received a fair trial, and there is simply no sufficient basis in law for a reversal that will entail so much cost in time and treasure to so many people.

I am prepared to assume that this trial was not perfect, for perfection in any human endeavor "is a rare commodity." *Allen v.. United States,* 603 A.2d 1219, 1228 (D.C.1992) (en banc). But any retrial will probably be even less perfect. The accident in this case occurred on September 25, 1995. The new trial is unlikely to take place less than six years after the fact. By then, the memories of the witnesses may well have eroded considerably. For reasons that I have explained, I differ with my colleagues significantly with respect to the doctrinal principles applicable to this case. But looking at the case realistically, the practical consequences of this reversal strike me as most unfortunate.

In conclusion, I suggest that *en banc* review may be appropriate of

---

12. If "she's" and "that's" are each considered to be one word, rather than two, then the challenged portion of the argument consists of only twenty-two words.

1. the contrast between the majority's approach and what I consider to be the well-established standard of review applicable to a judge's denial of a challenge of a prospective juror for cause; and

2. the status in this jurisdiction of the "claims-minded plaintiff" doctrine, in light of the rule of *M.A.P. v. Ryan.* In the meantime, I respectfully dissent.